UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

CESAR CASTRO,

                              Plaintiff,                **MEMORANDUM & ORDER**
                                                     15-CV-336 (MKB)

        v.

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiff Cesar Castro filed the above-captioned action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security (the "Commissioner"), denying his claim for Social Security disability insurance benefits. The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the decision of Administrative Law Judge Moises Penalver (the "ALJ") is supported by substantial evidence and should be affirmed. (Comm'r Notice of Mot. for J. on Pleadings, Docket Entry No. 15; Comm'r Mem. of Law in Supp. of Mot. for J. on the Pleadings ("Comm'r Mem."), Docket Entry No. 16.) Plaintiff cross-moves for judgment on the pleadings. (Pl. Cross-Mot. for J. on Pleadings, Docket Entry No. 17; Pl. Mem. of Law in Supp. of Cross-Mot. for J. on the Pleadings ("Pl. Mem."), Docket Entry No. 18.) For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted.

## I.   Background

Plaintiff is a forty-nine-year-old man with a high school education. (R. 23.) Plaintiff last worked on January 19, 2009 as a heating, ventilation and air conditioning ("HVAC") installer

and servicer.  (R. 86.)  Plaintiff applied for disability insurance benefits on October 6, 2009, with an alleged disability onset date of January 19, 2009.  (R. 16.)  Plaintiff complained of neck and lower back impairments, an amputated right hand, asthma, arthritis and depression.  (R. 18.) Plaintiff's application was denied on February 2, 2010, and he timely requested a hearing before an ALJ.  (R. 139.)  The hearing was held before ALJ Wallace Tannenbaum ("ALJ Tannenbaum") on September 9, 2010.  (*Id.*)  On September 17, 2010, ALJ Tannenbaum issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act").  (R. 145–46.)  Plaintiff appealed ALJ Tannenbaum's decision to the Appeals Council and, on April 26, 2012, the Appeals Council granted Plaintiff's appeal and remanded the matter for another hearing.  (R. 151–52.)  A second hearing was held before the ALJ on September 26, 2012.  (R. 16.)  On March 15, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  (R. 25.)  Plaintiff appealed the ALJ's decision to the Appeals Council.  (R. 1.)  On December 8, 2014, the Appeals Council denied review of the ALJ's decision.  (R. 1–4.)

   a.  **Plaintiff's testimony**

      i.  **September 9, 2010 hearing**

At the September 9, 2010 hearing, Plaintiff testified that his right hand was amputated in 1984.  (R. 60.)  From the time of his amputation until January of 2009, Plaintiff worked as an HVAC installer and servicer.  (R. 61.)  In January of 2009, Plaintiff suffered a workplace injury when he attempted to grab a falling twenty-four foot ladder and felt a "pop" in his back.[1] (R. 68.)  As a result of injuring his back, Plaintiff stopped working in January of 2009.  (R. 59.) Plaintiff can no longer work in the air conditioning field because it is too physically demanding

---

[1]  Plaintiff filed a worker's compensation claim, which settled.  (R. 59.)

given his back injury.  (R. 63–64.)

As a result of the workplace injury, Plaintiff suffers from back pain "all the time." (R. 62.)  Since injuring his back, Plaintiff has been treated by multiple doctors, including a primary care physician, an orthopedist, a neurologist and a psychologist.  (R. 60, 65–66.) "Shortly" after the accident occurred, Plaintiff began visiting an orthopedist for weekly physical therapy sessions and, at the time of the September 9, 2010 hearing, he was being treated by this orthopedist.  (R. 60, 64.)  Plaintiff's doctors have advised him to undergo surgery, but Plaintiff has declined to have surgery.  (R. 62.)

Plaintiff has been depressed since his workplace injury.  (R. 67.)  He is unable to bathe by himself and his wife washes him from the waist down.  (R. 71.)  Because he is unable to bend, he cannot dress himself and needs assistance to tie his shoes and button his shirt.  (R. 70.)  He is unable to walk more than three blocks without having to stop, (R. 71), and is unable to drive, (R. 63).

Plaintiff spends his average day attempting to exercise and engaging in physical therapy at home, but he has not noticed any improvement as a result of the physical therapy.  (R. 64.) Plaintiff rests whenever he begins to feel back pain.  (R. 69.)  Plaintiff rated his pain as an eight on a scale of ten.  (R. 69.)

### ii.    September 26, 2012 hearing

At the September 26, 2012 hearing, Plaintiff explained that his right hand was amputated when he was seventeen or eighteen years old.  (R. 92.)  Plaintiff is still able to write and use the telephone, and was able to work before he suffered his workplace injury.  (*Id.*)  Plaintiff last worked on January 19, 2009, the date of his workplace accident.  (R. 86.)  At the time of his accident, Plaintiff had been working as an HVAC installer and servicer for about eight years.

(R. 102–03.)  Before that, Plaintiff did "home improvements" by working on "flooring, siding, and roofing."  (R. 103.)

After his workplace injury, Plaintiff participated in physical therapy sessions for a year. (R. 89.)  Two months before the September 26, 2012 hearing, Plaintiff resumed physical therapy, which was helping to alleviate his pain.  (R. 90.)  Plaintiff also received treatment from a chiropractor.  (*Id.*)  The chiropractor focused his treatment on Plaintiff's middle and lower back, while the physical therapy sessions focused on Plaintiff's upper back and neck.  (R. 94.)

Plaintiff described the pain he feels as "pins and needles" and stated that it radiates down his left leg, resulting in numbness in his left leg.  (R. 87.)  Plaintiff experiences constant pain every day, which is exacerbated by sitting, walking or standing for "too long."  (R. 87–88.) Plaintiff feels pain in his left arm and shoulder when he moves his neck left or right.  (R. 93.) Plaintiff takes over-the-counter pain medications to relieve his pain because his doctors fear the risk of addiction if they prescribe stronger pain medications.  (R. 88.)  Plaintiff's doctors have suggested that he consider epidural injections to treat his pain, but because of Plaintiff's concern that the injections would provide only temporary relief and would "enhance" his pain once they wore off, he has refused this course of treatment.  (R. 88–89, 101–02.)

Plaintiff can walk continuously for no more than thirty minutes before experiencing back pain and needing to rest for twenty minutes.  (R. 90–91.)  Plaintiff can stand continuously for thirty minutes and sit continuously for five minutes before his back pain forces him to change positions.  (R. 91.)  Plaintiff can lift ten pounds occasionally.  (R. 91–92.)

Plaintiff has a driver's license but stopped driving four years before the hearing.  (R. 84.) Plaintiff attends one-hour religious services every other Saturday but has difficulty sitting for the entire time because of his lower back pain.  (R. 85.)  He walks five blocks every other day to

visit his relatives. (*Id.*) Plaintiff is unable to sweep, mop, vacuum, shop for groceries or wash his laundry, and can wash only a few dishes. (R. 87.)

Plaintiff has asthma which is triggered by pollen, dander and cats, and he has suffered from asthma for his entire life. (R. 94–95.) He has never been admitted to the hospital as a result of his asthma, and he uses an inhaler approximately one time per month. (*Id.*) Plaintiff suffers from arthritis in his hand and knees, but he has not received any treatment for his arthritis. (R. 95–96.) As a result of Plaintiff's back injury and his inability to work, he has experienced mental health problems. (R. 97.) Plaintiff first visited Dr. Puro, a mental health specialist, in May of 2012, and has been visiting Dr. Puro twice a week since his first visit. (R. 97–98.) Plaintiff has never been hospitalized for mental health reasons. (*Id.*) Plaintiff has difficulty concentrating as a result of his mental health challenges. (R. 100.)

### b. Medical evidence

Immediately after injuring his back on January 21, 2009, Plaintiff was treated at Richmond University Medical Center. Thereafter, from 2009 to approximately 2013, Plaintiff received treatment from eight doctors with various specialties, including chiropractors, a neurologist, an orthopedic surgeon, a pain medicine specialist, a psychiatrist, an internist, a physiatrist and a psychologist. Plaintiff also underwent magnetic resonance imaging ("MRI") of his cervical and lumbar spine, and a consultative examination.

### i. Richmond University Medical Center

On January 21, 2009, the day of the workplace accident, Plaintiff went to Richmond University Medical Center. (R. 363.) Plaintiff complained of upper and lower back pain after lifting a ladder at work. (*Id.*) Dr. Osias Diaz examined Plaintiff's back and found diffuse tenderness in the "paralumbar area" and mild spasms. (*Id.*) Dr. Diaz prescribed muscle relaxants and ibuprofen for Plaintiff's pain. (R. 362.)

### ii. Dr. George Visvikis, M.D.

On February 20, 2009, Dr. George Visvikis, M.D., of Regional Radiology, conducted an MRI of Plaintiff's cervical spine. (R. 279.) The MRI revealed "broad based spondylotic ridging" and "marked right and moderate left neural foraminal narrowing" at C5–6. (*Id.*) An MRI of Plaintiff's lumbar spine from the same day revealed "straightening of the normal lumbar lordosis" but "no evidence of disc protrusion, spinal stenosis or neural foraminal narrowing." (R. 280)

On September 4, 2013, Dr. Visvikis performed an MRI of Plaintiff's lumbar spine. Dr. Visvikis compared the MRI with the February 20, 2009 MRI and noted that the current MRI revealed a "left paracentral disc extrusion" at L5–S1, "which appear[ed] to contact the left S1 nerve roots and mildly indent[] on the anterolateral aspect of the thecal sac." (R. 6 (capitalization omitted).)

### iii. Dr. John Piazza and Dr. Denny Julewicz

From 2009 through 2011, and from 2012 through at least 2013, Plaintiff received chiropractic treatments from Dr. John Piazza and Dr. Denny Julewicz. On March 24, 2009, Dr. Piazza examined Plaintiff. (R. 492–95.) Plaintiff complained of pain in his neck and lower back, which he rated as a seven or eight on a scale of ten. (R. 495.) Dr. Piazza noted that Plaintiff's cervical and lumbar spine showed flexion, extension, lateral flexion, and rotation that were below normal ranges and observed that these motions caused Plaintiff pain. (R. 492.) Upon examining Plaintiff, Dr. Piazza noted "tenderness to palpation on the lumbar and cervical spine," a "positive [D]eerfield" test, "subluxation at the level of C2 on the left, C4 on the right, C5 on the right, C7 on the left, L5 on the left, and L4 on the right," "asymmetry/misalignment" in Plaintiff's "cervical and lumbar area," and "myospasms of the lumbo-sacral spine of the

paralumbar bilateral muscle." (R. 496 (capitalization omitted).) X-rays of Plaintiff's cervical and lumbar spine taken that day revealed intervertebral foramen encroachment at L5–S1, left lateral flexion malposition at L1, L2, L3, L4, and L5, decreased disc spacing at C5–C6 and hypolordosis of the cervical spine. (R. 455.) Dr. Piazza stated that Plaintiff was "on total work restriction." (*Id.*) Dr. Piazza treated Plaintiff with mechanical traction applied to Plaintiff's cervical and lumbar spine, spinal adjustment and moist heat. (*Id.*)

Plaintiff began seeing Dr. Piazza for weekly chiropractic treatment. (R. 498–527.) From March 24, 2009 through May 9, 2009, Dr. Piazza's findings and diagnoses remained unchanged.[2] (R. 498–527.) On May 9, 2009, Dr. Piazza stated that Plaintiff had a mild permanent partial disability. (R. 528–29.) On July 29, 2009, Plaintiff reported that his lower back pain had "improved by 70% since beginning treatment," and Dr. Piazza opined that Plaintiff could return to work on August 10, 2009. (R. 549–51.) However, on August, 5, 2009, Dr. Piazza changed his position and stated that Plaintiff was "on total work restriction." (R. 553.)

On September 24, 2009 and October 8, 2009, Dr. Piazza and Dr. Julewicz jointly completed reports in connection with Plaintiff's workers' compensation claim.[3] (R. 292–95.) They diagnosed Plaintiff with a lumbar strain, which was affecting his cervical spine, and stated that Plaintiff had a moderate partial disability. (*Id.*) They noted that Plaintiff's complaints of pain were consistent with the history of his injury and their objective findings. (R. 293, 295.)

---

[2] The Court notes only changes in Dr. Piazza's and Dr. Julewicz's examination findings and diagnoses.

[3] The September 24, 2009 report was based on Dr. Piazza's and Dr. Julewicz's examinations of Plaintiff on September 17 and 23 of 2009. (R. 294.) The October 8, 2009 report was based on their examinations of Plaintiff on October 1 and 6 of 2009. (R. 292.)

They determined that Plaintiff could return to work but that Plaintiff could not lift more than twenty pounds and could not sit or stand for more than one to two hours. (*Id.*)

On January 22, 2010, Dr. Julewicz examined Plaintiff. (R. 331–36.) Plaintiff told Dr. Julewicz that he was still experiencing severe lower back pain and that, although the chiropractic treatments relieved his pain temporarily, the pain was relatively consistent. (R. 331.) Plaintiff rated his pain as a six on a scale of ten and stated that he felt the pain "frequent[ly]." (R. 332.) Dr. Julewicz concluded that Plaintiff had a mild permanent partial disability, discharged Plaintiff from his care, and referred Plaintiff for a pain management evaluation and a psychiatric evaluation.[4] (R. 333–36.)

On May 9, 2012, Dr. Piazza examined Plaintiff. (R. 612.) Plaintiff told Dr. Piazza that he had frequent lower back pain that radiated to his left leg. (R. 613.) He rated the intensity of his pain as an eight on a scale of ten. (*Id.*) Dr. Piazza diagnosed Plaintiff with "segmental dysfunction of the lumbar spine" and "right L5/S1 radiculopathy." (R. 615 (capitalization omitted).)

Plaintiff resumed regular chiropractic treatment. (R. 612–72.) On September 7, 2012, the final report in the record, Plaintiff was examined by Dr. Victoria Scarano-Afflitto, a chiropractor in the same practice as Dr. Piazza and Dr. Julewicz. (R. 673–78.) Dr. Scarano-Afflitto noted that Plaintiff "continue[d] to show functional improvement" and that Plaintiff's reported pain intensity improved from a six on a scale of ten to a four on a scale of ten. (R. 673.)

---

[4] Plaintiff contends that he was discharged from chiropractic treatment because of a "lack of insurance coverage." (Pl. Mem. 10.) Plaintiff further contends that on April 3, 2012, the New York State Worker's Compensation Board concluded that Plaintiff had "permanent partial disability" and that "[a]s a result of this decision, Plaintiff regained insurance coverage and was again able to obtain regular treatment and therapy." (*Id.* at 12.)

### iv. Dr. Bhim Nangia, M.D.

On March 28, 2009, Plaintiff visited Dr. Bhim Nangia, M.D., a neurologist, for a consultation. (R. 324.) Plaintiff complained of neck pain that radiated to this left shoulder and arm, numbness in his left arm and hand, "constant persisting lower back pain" that radiated down both legs, and numbness in both legs. (*Id.*) Upon examining Plaintiff's cervical spine, Dr. Nangia noted "moderate suboccipital tenderness" and paraspinal muscle spasms "with restriction in the range of motion." (R. 325.) Dr. Nangia also performed a foraminal compression test which was positive. (*Id.*) Dr. Nangia observed "multiple areas with mild tenderness" along Plaintiff's lumbosacral spine and paraspinal muscles, as well as paraspinal spasms "with restricted range of motion." (*Id.*) Plaintiff's gait was antalgic without ataxia and his tandem gait was normal. (*Id.*) Dr. Nangia diagnosed Plaintiff with "cervicalgia," "cervical muscle post-traumatic sprain syndrome," "lumbalgia," "lumbosacral muscle post-traumatic sprain syndrome," rule out "traumatic herniation of the cervical intervertebral disc," rule out "cervical radiculopathy," rule out "traumatic herniation of the lumbar intervertebral disc," and rule out "lumbosacral radiculopathy."[5] (R. 326 (capitalization omitted).) Dr. Nangia recommended physical therapy, chiropractic and acupuncture consultations, nerve conduction studies, and told Plaintiff to continue taking Vicodin ES and Flexeril. (*Id.*) Following his examination, Dr.

---

[5] "Rule-out" references a provisional diagnosis to be ruled out with further medical investigation. *See Straughter v. Comm'r of Soc. Sec.*, No. 12-CV-825, 2015 WL 6115648, at *16 n.38 (S.D.N.Y. Oct. 16, 2015) (explaining that psychiatric diagnoses were "rule-out or hypothetical diagnosis needing further exploration"); *Beach v. Comm'r of Soc. Sec.*, No. 11-CV-2089, 2012 WL 3135621, at *8 (S.D.N.Y. Aug. 2, 2012) ("In the medical context, a 'rule-out' diagnosis means there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out." (quoting *Carrasco v. Astrue*, No. 10-CV-43, 2011 WL 499346, at *4 (C.D. Cal. Feb. 8, 2011)).

Nangia completed a report in connection with Plaintiff's workers' compensation claim in which he opined that Plaintiff was "unable to do any type of work." (R. 291.)

On October 21, 2009, Dr. Nangia had a follow-up consultation with Plaintiff. (R. 340–42.) Plaintiff complained of neck pain that radiated to his left shoulder and arm, numbness in his left arm, lower back pain that radiated down both legs, numbness in both legs, the inability to lift heavy objects, and difficulty in walking or sitting. (R. 340.) Plaintiff rated his pain as a six or seven on a scale of ten. (*Id.*) Dr. Nangia examined Plaintiff and noted that Plaintiff's cervical muscles appeared asymmetrical, and he observed that Plaintiff had tenderness and muscle spasms in his paraspinal muscles. (*Id.*) Plaintiff's cervical spine and lumbar spine exhibited flexion, extension, left and right rotation, and left and right lateral flexion that were below "normal" ranges. (R. 340–41.) Dr. Nangia diagnosed Plaintiff with cervical sprain, cervical radiculitis, lumbar strain, and lumbar radiculitis. (R. 341.) Dr. Nangia stated that Plaintiff's workplace accident was the cause of his injuries, that Plaintiff's complaints were consistent with the history of his injury, and that Plaintiff had a fifty percent temporary impairment. (R. 342.)

On October 31, 2009, Dr. Nangia performed nerve conduction studies on Plaintiff, which revealed evidence of "left C5–6 radiculopathy." (R. 337–39.)

On December 1, 2009, based on his October 21 and 31, 2009 examinations of Plaintiff, Dr. Nangia completed a report in connection with Plaintiff's workers' compensation claim. (R. 282–85.) Dr. Nangia diagnosed Plaintiff with a neck sprain, lumbar sprain, brachial neuritis or radiculitis, and "thoracic/lumbosacral" neuritis or radiculitis. (R. 282.) Dr. Nangia noted that Plaintiff's complaints of pain were consistent with the history of Plaintiff's injury and with his objective findings. (R. 283, 285.) Dr. Nangia stated that Plaintiff had a fifty percent disability and could not work due to the injuries he sustained on January 19, 2009. (*Id.*)

On February 8, 2010, Dr. Nangia performed nerve conduction studies on Plaintiff, which revealed evidence of "right L5 S1 radiculopathy." (R. 433.)

On October 22, 2010, Dr. Nangia had a follow up visit with Plaintiff. (R. 423–25.) Dr. Nangia noted that Plaintiff's symptoms showed "no improvement" and that Plaintiff fractured his left knee on October 19, 2010, for which he received treatment at St. Vincent's Hospital. (R. 423.) Dr. Nangia examined Plaintiff and determined that Plaintiff had cervical and lumbosacral radiculopathy and stated that Plaintiff had a fifty percent permanent total disability and was unable to work because of his "persistent neurological symptoms." (R. 425.)

### v. Dr. Jonathan Gordon, M.D.

On October 6, 2009, Dr. Jonathan Gordon, M.D., an orthopedic surgeon at Beth Israel Medical Center, examined Plaintiff. (R. 343–44.) Dr. Gordon noted that Plaintiff's neck and lower back pain had worsened[6] and observed that Plaintiff was not in "apparent distress during the examination." (R. 343.) He determined that Plaintiff's neck "show[ed] flexion to [thirty degrees], extension to [zero degrees], and lateral bending to [twenty degrees]." (*Id.*) Plaintiff's lower back "show[ed] flexion to [ninety degrees], extension to [zero degrees] and lateral bending to [twenty degrees]." (*Id.*) Dr. Gordon noted paraspinal pain, spasms and tenderness of both Plaintiff's neck and lower back. (*Id.*) He diagnosed Plaintiff with lower back strain and cervical spine strain and recommended that Plaintiff start physical therapy sessions. (R. 344.)

On October 9, 2009, Dr. Gordon completed a report in connection with Plaintiff's workers' compensation claim. (R. 296–97.) Based on his October 6, 2009 examination of Plaintiff, Dr. Gordon diagnosed Plaintiff with sciatica and a thoracic sprain and rated Plaintiff's

---

[6] Dr. Gordon's notes refer to the October 6, 2009 examination of Plaintiff as a "follow up" examination but there is no evidence of an earlier visit in the record.

impairment as one hundred percent.  (*Id.*)  Dr. Gordon noted that Plaintiff could not return to work for three to seven days due to his pain.  (R. 297.)

### vi.  Dr. Andrew Davy, M.D.

On October 13, 2009, Dr. Andrew Davy, M.D., a pain medicine specialist, had an initial consultation with Plaintiff.  (R. 412–15.)  Plaintiff told Dr. Davy that he constantly felt pain in his neck and lower back.  (R. 412.)  Plaintiff rated the intensity of the pain in his neck as a nine on a scale of ten and rated the pain in his lower back, which radiated to Plaintiff's right leg, as an eight on a scale of ten.  (*Id.*)  Dr. Davy examined Plaintiff and observed that Plaintiff's gait was antalgic to the left.  (R. 414.)  Dr. Davy observed that Plaintiff experienced pain on forward flexion and experienced "increased pain" on extension of the lumbosacral spine.  (*Id.*)  A straight leg raising test was positive on the left.  (*Id.*)  Dr. Davy observed that Plaintiff's neck and shoulders exhibited "multiple myofascial trigger points" and that Plaintiff's facet joints were tender.  (*Id.*)  He also noted that there was no atrophy, fasciculations or allodynia in Plaintiff's upper or lower extremities.  (*Id.*)  Dr. Davy diagnosed Plaintiff with "low[er] back pain secondary to lumbar post-traumatic disc pathology," "lumbar radiculopathy," "neck pain secondary to cervical post-traumatic disc pathology," "cervical radiculopathy," and "multiple myofascial trigger points."  (*Id.*)  Dr. Davy noted that he "[could] not rule out facet syndrome." (*Id.*)  He concluded that Plaintiff had a "marked partial disability" as a result of the workplace accident that Plaintiff suffered on January 19, 2009.  (R. 415.)  He recommended that Plaintiff receive diagnostic facet nerve injections and epidural steroid injections in his neck and lower back.  (R. 414–15.)

### vii. Dr. Solomon Miskin, M.D.

On August 13, 2010, Dr. Solomon Miskin, M.D., of Industrial Medicine Associates, conducted a psychiatric examination of Plaintiff. (R. 354–57.) Dr. Miskin noted that Plaintiff reported that his lower back injury resulted in pain, discomfort, limited mobility and "associated bouts of frustration and disappointment." (R. 355.) Dr. Miskin observed that Plaintiff was "alert and oriented in all spheres" and that Plaintiff's speech, response time, comprehension, affect, mood, sensorium, memory, insight, and judgment were all "clear" or "good." (R. 356.) He saw "no overt evidence of a thought disorder." (*Id.*) Dr. Miskin diagnosed Plaintiff with "[a]djustment disorder with mixed emotional features" of "mild to very mild severity." (*Id.*)

### viii. Dr. Mamdouh Lozah, M.D.

On September 3, 2010, Dr. Mamdouh Lozah, M.D., an internist at Staten Island Physician Practice, examined Plaintiff. (R. 437–39.) Plaintiff complained of lower back pain, which he rated a four on a scale of ten. (R. 437.) Plaintiff told Dr. Lozah that the pain did not radiate, was aggravated by twisting or walking, and was relieved by pain medication and rest. (*Id.*) Upon examining Plaintiff, Dr. Lozah observed that Plaintiff's neck was "supple" and that his thyroid was symmetrical, "without thyromegaly, masses or palpable nodules." (R. 438.) X-rays of the lumbar spine taken that day revealed "[m]inimal osteophytic spurring" but were "[o]therwise unremarkable." (R. 436.) Dr. Lozah diagnosed Plaintiff with a "backache" and prescribed Zanaflex, Mobic and Hydrocodone-acetaminophen, as well as a Toradol injection. (R. 438–39.)

On September 27, 2010, Dr. Lozah had a follow up visit with Plaintiff. (R. 441–42.) Dr. Lozah observed muscle spasms in Plaintiff's lumbar spine and that Plaintiff experienced "moderate pain w[ith] motion." (R. 442.) Dr. Lozah diagnosed Plaintiff with having a disc

disorder in Plaintiff's lumbar region and prescribed Arthortec and Flexeril. (*Id.*) He referred Plaintiff to Dr. Jack D'Angelo. (*Id.*)

### ix. Dr. Jack D'Angelo, M.D.

On October 20, 2010, Dr. Jack D'Angelo, M.D., a physiatrist at Forest Rehabilitation Medicine, examined Plaintiff. (R. 470–74.) Plaintiff complained of constant lower back pain that radiated down both legs, and constant neck pain and stiffness that caused numbness in his left hand. (R. 470.) Plaintiff reported that visiting his chiropractor and performing physical therapy relieved his pain only temporarily. (*Id.*) Upon examining Plaintiff, Dr. D'Angelo observed that Plaintiff walked with a cane and had a stiff gait. (R. 471.) Plaintiff's cervical spine showed flexion of forty degrees and extension of thirty degrees with pain, and Dr. D'Angelo noted "trigger points along the left scapular border with reproducible referred pain in the left arm," which was "diffuse throughout the cervical paraspinals." (*Id.*) Plaintiff's lumbar spine showed flexion of seventy degrees and extension of five degrees with pain, and Dr. D'Angelo noted "loss of normal lordosis." (*Id.*) Dr. D'Angelo also noted that a straight leg raising test was positive for back pain. (*Id.*) Dr. D'Angelo diagnosed Plaintiff with "lumbar disc disease with radicular signs," "cervical strain" and "muscle spasm with myofascial pain." (R. 471 (capitalization omitted).) He determined that Plaintiff was "clearly disabled." (R. 472.) Dr. D'Angelo treated Plaintiff's "lumbar spine region" with a "TMR 1200," a medical device that uses "ultra-high frequency pulsed therapy" to relieve Plaintiff's pain. (R. 472–74.)

On November 17, 2010, Dr. D'Angelo examined Plaintiff and noted that the TMR 1200 treatment resulted in "improvement in [Plaintiff's] pain thresholds and functional tolerance" and performed another treatment with the TMR 1200. (R. 475–79.) Dr. D'Angelo affirmed his diagnosis of "lumbar disc disease with radicular signs," "cervical strain" and "muscle spasm with

myofascial pain." (R. 476 (capitalization omitted).)  He also affirmed his determination that Plaintiff was "clearly disabled."  (R. 477.)

### x.  Dr. David Puro, Psy.D.

On May 23, 2012, Dr. David Puro, Psy.D., a psychologist, examined Plaintiff.  (R. 480–87.)  Dr. Puro noted that Plaintiff reported experiencing depression, stress, tension, difficulty concentrating, sleep disturbances, headaches, vocational problems, low energy, sad mood, forgetfulness and loss of appetite.  (R. 481.)  Dr. Puro observed that Plaintiff's gait was normal, his posture was tense, his motor behavior was restless, his mood was anxious and depressed, and that Plaintiff exhibited mild distress.  (R. 481–82.)  Dr. Puro also observed signs of anxiety but no indication of delusions or hallucinations and noted that Plaintiff's attention and concentration skills were impaired.  (R. 482.)  Upon examining Plaintiff, Dr. Puro determined that Plaintiff was experiencing moderate depression, a moderate level of distress, minimal anxiety, and a minimal sense of hopelessness.  (R. 484–85.)  Dr. Puro diagnosed Plaintiff with "adjustment disorder with depression," and he recommended that Plaintiff participate in psychotherapy.  (R. 487 (capitalization omitted).)

On August 28, 2012, Dr. Puro completed a mental functional capacity assessment. (R. 448–51.)  Dr. Puro stated that he had been treating Plaintiff on a bi-weekly basis since May 23, 2012.  (R. 448.)  He described Plaintiff as "severely depressed, anxious and agitated" and noted that Plaintiff had problems sleeping, concentrating and focusing.  (*Id.*)  Dr. Puro determined that Plaintiff was able to minimally function outside the home and noted that Plaintiff had experienced three or more episodes of decompensation.  (*Id.*)  Dr. Puro also determined that Plaintiff had moderate limitations to his abilities to: understand, remember and carry out instructions; respond appropriately to supervision; respond to co-workers; satisfy an employer's

normal quality, production and attendance standards; respond to customary work pressure; and perform simple tasks on a sustained basis. (R. 449–50.) Dr. Puro further determined that Plaintiff had marked limitations in his activities of daily living and social functioning, and that he had severe deficiencies in his concentration, persistence and pace, which would make Plaintiff unable to complete tasks in a timely manner. (R. 450.) Dr. Puro determined that Plaintiff was incapable of tolerating "low" work stress and that Plaintiff would likely miss more than three days of work each month. (*Id.*) Dr. Puro also determined that Plaintiff would have difficulty working at a regular job on a sustained basis because he was totally disabled. (R. 451.)

### xi. Dr. Chitoor Govindaraj

On December 15, 2009, Plaintiff underwent a consultative examination with Dr. Chitoor Govindaraj, M.D., after a referral from the New York State Division of Disability Determinations. (R. 303.) Plaintiff complained of neck and back pain and told Dr. Govindaraj that he was engaging in physical therapy sessions three times each week for "low[er] back pain, stiffness of the neck, [and] right thumb numbness." (*Id.*) Dr. Govindaraj noted that Plaintiff had a history of "EMG nerve conduction of the left lower and left upper extremity." (R. 304.)

Upon examining Plaintiff, Dr. Govindaraj determined that Plaintiff's spine showed a normal range of motion, except for "voluntary hold," and he observed no kyphoscoliosis, gibbus or tenderness. (R. 305.) Dr. Govindaraj examined Plaintiff's central nervous system and observed that Plaintiff's "[r]ange of motion of the back and joints is normal" and that, while seated, Plaintiff was able to "flex both hip joints against resistance with no pain in the lumbar area," and extend both knees "against resistance with no pain in the lumbar area." (*Id.*) Dr. Govindaraj found no evidence of "subluxation, contractures, ankylosis, instability, redness, heat or swelling." (*Id.*) He observed that Plaintiff's gait and posture were normal and that Plaintiff

did not need a cane for ambulation. (*Id.*) Dr. Govindaraj determined that Plaintiff had a history of bulging disc at L5–S1 and that Plaintiff was "currently stable for occupation." (R. 305.)

### c. Additional evidence

#### i. Sandip Patel, physical therapist

On December 23, 2009, Sandip Patel, a physical therapist at Neuro Rehabilitation Medical Services, evaluated Plaintiff's functional capacity. (R. 397–401.) He noted that Plaintiff rated the pain in his back and neck as a seven on a scale of ten and reported that the pain caused numbness in his left hand and leg. (R. 398.) Patel observed that Plaintiff's "[b]ilateral upper extremity coordination" and "[b]ilateral grip" were within "normal" limits and that Plaintiff was able to stand for about twenty minutes. (*Id.*) Patel determined that Plaintiff had a decreased range of motion in his neck and lower back, decreased tolerance for sitting upright, decreased ability for activities above shoulder level, an inability to lift more than ten pounds, increased lower back pain, "trunk instability," and a loss of balance when Plaintiff exerted "strong effort[]." (*Id.*) Patel also determined that Plaintiff could lift, push, pull or carry ten pounds for "1–5 percent of [an] 8 hour day"; could sit, squat, kneel or crawl for "6–33 percent of [an] 8 hour day"; and could stand, walk or climb stairs for "34–66 percent of [an] 8 hour day." (R. 400–01.) Patel concluded that Plaintiff's functional capacities did not meet the "minimal job requirement." (R. 399.)

#### ii. Dennis Guttman, L.C.S.W.

On January 29, 2010, Dennis Guttman, a licensed clinical social worker at Anxiety Alternatives, evaluated Plaintiff. (R. 330.) Guttman noted that Plaintiff was in constant pain, which was "amplified by his psychological state." (*Id.*) Guttman also noted that Plaintiff was worried that he would not be able to return to work and support his family. (*Id.*) Guttman diagnosed Plaintiff with depressive disorder and recommended weekly psychotherapy. (*Id.*)

### iii.    Function report

On October 22, 2009, Plaintiff completed a "Function Report," detailing his activities and limitations. (R. 234–48.) According to this report, Plaintiff first started experiencing pain "on January 19, the day of the accident." (R. 242.) Plaintiff described the pain in his neck and lower back as "stabbing," "pinching," "stiff" and "cramping." (R. 242–43.) He stated that his pain radiates to his legs and left hand. (R. 243.)

Plaintiff lives in an apartment with his family. (R. 235.) During the day, Plaintiff gets up, walks around, and does physical therapy for his back. (R. 236.) Plaintiff's back pain affects his sleep, prevents him from putting on his shoes and sometimes his shirt, requires him to get help when washing himself, and prevents him from standing too long in the shower. (*Id.*) Plaintiff has difficulty preparing meals because standing, bending and kneeling are painful. (R. 237.) Plaintiff's wife prepares his meals. (*Id.*) Plaintiff's back pain prevents him from working inside the house or in the yard. (R. 238.) He does not go out of his home alone because he "sometimes" feels severe back pain that prevents him from walking. (*Id.*) Plaintiff can walk "about half a block" before having to stop and rest. (R. 241.) When Plaintiff goes shopping, his children carry the bags. (R. 239.) Plaintiff goes to church but is unable to sit for a long period and has to stand and walk around. (*Id.*) Plaintiff cannot lift anything heavy, stand, sit, walk for a long period, or kneel or squat. (R. 240.) Walking, standing and sitting for too long exacerbates Plaintiff's pain. (R. 243.) Plaintiff uses an artificial limb for his missing right hand and a back brace, both of which were prescribed by his doctors. (*Id.*)

### iv.    Residual functional capacity assessment

On February 1, 2010, "M. Sloane" reviewed Plaintiff's medical file and completed a residual functional capacity ("RFC") assessment, diagnosing Plaintiff with a history of bulging

disks, L5–S1, "neck sprain and strain." (R. 310.) Sloane noted multiple exertional limitations, including Plaintiff's ability to (1) "lift and/or carry" twenty pounds occasionally and ten pounds frequently, (2) "stand and/or walk" with normal breaks for a total of "about" six hours in an eight-hour workday, (3) sit with normal breaks for a total of "about" six hours in an eight-hour workday, and (4) "push and/or pull," which was "limited in lower extremities." (R. 311.) Sloane based his findings on his review of a December 15, 2009 "examination report" from Brook-Island Medical Group, which noted that Plaintiff's "spine range of motion, except for voluntary hold, [wa]s WNL," and an X-ray of Plaintiff's lumbosacral spine, which "reveal[ed] mild anterior osteophytic spurring at L3–4." (R. 311.) Sloane also determined that Plaintiff's postural limitations limited him to occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling. (R. 311–12.) Sloane further found that Plaintiff's manipulative limitations were due to "numbness of [Plaintiff's] right thumb" and that Plaintiff had "limited" fine manipulation. (R. 312.) Sloane did not observe any visual, communicative or environmental limitations. (R. 312–13.)

### d. Vocational expert testimony

Vocational expert Pat Green testified by telephone at the September 26, 2012 hearing. (R. 108–68.) Green testified that Plaintiff's job as an HVAC installer and servicer was skilled work at a heavy to very heavy level, with a specific vocational preparation ("SVP") of seven. (R. 115–16.) His job as a security guard was semi-skilled work at a light level with an SVP of three. (R. 116.) Green also determined that Plaintiff's work in home improvement, which Green defined as construction, was skilled work at a medium level with an SVP of seven. (*Id.*)

The ALJ asked Green to consider a hypothetical individual "of [Plaintiff's] age, education, and work experience . . . who is limited to a reduced range of light work." (R. 117.) The ALJ included the following limitations in his hypothetical: "lift/carry up to 20 pounds

occasionally and 10 pounds frequently; stand and walk for approximately five hours per eight-hour work day and sit for approximately five hours per eight-hour work day . . . can push or pull only occasionally using the upper extremities." (*Id.*) The ALJ added the "following postural limitations: [n]ever climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally stoop; occasionally crouch; occasionally kneel; occasionally crawl" as well as a complete lack of gross and fine manipulation with the non-dominant right hand. (*Id.*) He also added environmental limitations, stating that the "hypothetical individual must avoid concentrated exposure to irritants such as fumes, odors, dust, and gases." (*Id.*) Finally, the ALJ included the following mental health limitations: "such individual is limited to work in a low-stress job, which is defined as having only decision making required and such individual cannot work in a fast-paced work environment, which is defined as constant activity with work task performed sequentially in rapid succession." (R. 117–18.)

Green testified that an individual with such limitations could not work as an HVAC installer or servicer, a security guard or in construction. (R. 118.) The ALJ asked Green whether there were "other jobs in the economy that such an individual could perform," and Green testified that such an individual could work as an addresser and as an order clerk, which have an SVP of two. (R. 118–19.)

The ALJ presented another hypothetical, asking Green to assume the first hypothetical person, but added that the hypothetical person could "sit or stand alternatively at will, provided that the person is not off task more than 5 percent of the work period," "is limited to simple, routine tasks," and could only occasionally be required to exercise judgment on the job. (R. 120–21.) Green testified that the added limitations would eliminate the two jobs he cited before, addresser and order clerk. (R. 122.)

### e. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration ("SSA") under the authority of the Act. First, the ALJ found that Plaintiff had not engaged in substantial activity during the period from the alleged onset date of his disability, January 19, 2009, through the date on which Plaintiff last met the insured status requirement, September 30, 2010. (R. 18.) Second, the ALJ found that Plaintiff had the following severe impairments: "a neck impairment, a lower back impairment, status post right hand amputation, asthma, arthritis, and a depressive disorder." (*Id.*)

Third, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or equals the severity of one of the impairments listed in Appendix 1 of the SSA Regulations. (R. 19.) The ALJ found that the medical evidence failed to establish findings or symptoms severe enough to qualify under Listing 1.02(B) (Joint Disorders); Listing 1.04 (Spine Disorders); or Listing 3.03 (Asthma). (*Id.*) The ALJ also found that Plaintiff's mental impairment did not meet the criteria under Listing 12.04 (Affective Disorders). (R. 19–20.) In determining that Plaintiff's mental impairment did not meet the criteria, the ALJ gave "little weight" to Dr. Puro's August 2012 opinion because there was "no evidence of significant limitations" prior to September 30, 2010, Plaintiff's last insured date. (R. 20.)

Fourth, the ALJ determined "that, through the date last insured, [Plaintiff] had the residual functional capacity to perform light work," subject to the following limitations:

> standing/walking limited to 5 hours total in an 8 hour workday;
> sitting limited to 5 hours in an 8 hour workday; the ability to push
> and pull items occasionally; the inability to climb ladders, ropes, or
> scaffolds; the ability to occasionally climb ramps or stairs; the
> ability to occasionally stoop, crouch, kneel, and crawl; the
> complete inability to handle objects (gross manipulation), finger
> objects (fine manipulation), or feel objects with the right hand; the
> need to avoid concentered exposure to bronchial irritants such as
> fumes, odors, dust, and gases; the ability to perform only a low

> stress job defined as having no more than occasional
> decision-making required; and the inability to work in a fast-paced
> work environment defined as constant activity with work tasks
> performed sequentially in rapid succession.

(R. 20.)  The ALJ concluded that, although Plaintiff's "medically determinable impairments could reasonably be expected" to cause Plaintiff's symptoms, Plaintiff's statements concerning "the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in [his] decision."  (R. 21.)

In reaching this conclusion, the ALJ relied on Dr. D'Angelo's physical examination, Patel's December 2009 physical therapy evaluation, and Dr. Nangia's March 2009, October 2009, and October 2010 examinations.  (R. 21–22.)  The ALJ found that "the objective testing in the record does not support a finding that [Plaintiff] cannot perform any work at all," based on the results of a February 2009 MRI of Plaintiff's cervical and lumbosacral spine, lumbosacral x-rays and nerve conduction studies.  (R. 22.)  The ALJ noted that, in September of 2009, Plaintiff reported to Dr. Piazza that Plaintiff's lower back pain was improving as a result of physical therapy, and he also noted that Plaintiff refused "treatments such as epidural injections" in spite of his "doctor's recommendations that this would be helpful for his particular condition." (*Id.*)

The ALJ accorded "little weight" to the opinions of Dr. Nangia, Dr. Davy and Dr. Piazza that Plaintiff was "totally disabled from all work" because they "impinge on an issue that is strictly reserved to the Commissioner."  (*Id.*)  The ALJ noted that the findings of the worker's compensation board was not binding on him and that, in any event, his findings were not "inconsistent" with the worker's compensation board's finding that Plaintiff is "partially" disabled.  (*Id.*)

Finally, the ALJ determined that Plaintiff was unable to perform his past relevant work as an HVAC installer or servicer, security guard or carpenter, because those jobs require tasks that exceed Plaintiff's RFC. (R. 23.) The ALJ stated that, given Plaintiff's age, education, work experience, RFC and the vocational expert's testimony that an individual with Plaintiff's RFC could perform work as an addresser and order clerk, there were a significant number of jobs in the national economy that Plaintiff could perform. (R. 24.) The ALJ therefore concluded that, during the period from January 19, 2009 through September 30, 2010, Plaintiff was not suffering from a "disability" as defined under the Act. (R. 25.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's

factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

**b. Availability of benefits**

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Social Security Act. To be eligible for disability benefits under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the

> [Commissioner] next considers whether the claimant has an
> impairment that is listed in Appendix 1 of the regulations. When
> the claimant has such an impairment, the [Commissioner] will find
> the claimant disabled. However, if the claimant does not have a
> listed impairment, the [Commissioner] must determine, under the
> fourth step, whether the claimant possesses the residual functional
> capacity to perform her past relevant work. Finally, if the claimant
> is unable to perform her past relevant work, the [Commissioner]
> determines whether the claimant is capable of performing any
> other work. If the claimant satisfies her burden of proving the
> requirements in the first four steps, the burden then shifts to the
> [Commissioner] to prove in the fifth step that the claimant is
> capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46

(2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential

evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520").

### c.  Analysis

The Commissioner moves for judgment on the pleadings, arguing that the ALJ's

determination that Plaintiff was not disabled is supported by substantial evidence. (Comm'r

Mem. 1.) Plaintiff cross-moves for judgment on the pleadings, arguing that the ALJ erred in

(1) his determination at Step Three that Plaintiff's impairments did not meet or medically equal

one of the impairments listed in Appendix 1 of the SSA regulations, (2) his assessment of

Plaintiff's RFC and (3) his assessment of Plaintiff's credibility. (Pl. Mem. 1.) Plaintiff also

argues that the Court should remand solely for the purpose of calculation of benefits. (*Id.*)

### i.  The ALJ's Step Three analysis

Plaintiff argues that medical evidence in the record demonstrates that his cervical and

lumbar spine impairments meet the criteria included in Listing 1.04(A), relating to disorders of

the spine. (Pl. Mem. 19.)

The third step of the five-step analysis for evaluating disability claims requires an ALJ to

determine whether a claimant's impairment meets the criteria of any of the impairments listed in

Appendix 1 of the SSA regulations. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The impairments

listed in Appendix 1 are "acknowledged by the [Commissioner] to be of sufficient severity to

preclude gainful employment," and therefore, if a claimant's impairment meets or equals "the

'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."

*DiPalma v. Colvin*, 951 F. Supp. 2d 555, 570 (S.D.N.Y. 2013) (quoting *Dixon v. Shalala*,

54 F.3d 1019, 1022 (2d Cir. 1995)). "For a claimant to show that his impairment matches a

listing, [the impairment] must meet all of the specified medical criteria. An impairment that

manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v.*

*Zebley*, 493 U.S. 521, 530 (1990); *Lipsett v. Colvin*, No. 13-CV-1746, 2016 WL 912163, at *5

(D. Conn. Mar. 7, 2016) (quoting *Sullivan*, 493 U.S. at 530). A claimant's impairment is the

medical equivalent of a listed impairment "if it is 'at least equal in severity and duration to the

criteria of any listed impairment.'" *Wood v. Colvin*, 987 F. Supp. 2d 180, 192 (N.D.N.Y. 2013)

(quoting 20 C.F.R. § 404.1526(a)).

Listing 1.04(A) provides in pertinent part:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus,
> spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative
> disc disease, facet arthritis, vertebral fracture), resulting in
> compromise of a nerve root (including the cauda equina) or the
> spinal cord. With:
>
> A. Evidence of nerve root compression characterized by
> neuro-anatomic distribution of pain, limitation of motion of the
> spine, motor loss (atrophy with associated muscle weakness or
> muscle weakness) accompanied by sensory or reflex loss and, if
> there is involvement of the lower back, positive straight-leg raising
> test (sitting and supine) . . . .

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04. In order to meet this listing, a claimant must

establish that he or she suffers from "a disorder of the spine which compromises a nerve root or

the spinal cord" and that this impairment produces "neuro-anatomic distribution of pain,

limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss *and*, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *McKinney v. Astrue*, No. 05-CV-0174, 2008 WL 312758, at *4 (N.D.N.Y. Feb. 1, 2008).

In support of his determination that Plaintiff's impairments did not meet Listing 1.04, the ALJ stated that "none of the medical records establishes findings or symptoms severe enough to qualify under listing 1.04." (R. 19.) The ALJ did not engage in any further discussion as to this Listing. (*See id.*) The ALJ's explanation for his determination with respect to Listing 1.04 is conclusory and therefore prevents the Court from assessing whether this determination is supported by substantial evidence. *See Cherico v. Colvin*, No. 12-CV-5734, 2014 WL 3939036, at *28 (S.D.N.Y. Aug. 7, 2014) (remanding where the ALJ supported his step three determination by "stat[ing], in entirely conclusory terms, . . . 'that the objective medical evidence of record does not support a finding that the claimant experienced symptoms or limitations of a severity sufficient to meet'" Listing 1.04 because "[t]his mode of explanation [wa]s patently inadequate"); *Wood*, 987 F. Supp. 2d at 192 (remanding where the ALJ supported his or her step three determination by stating only that the "medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination" because "[b]ased on this scant explanation" the court could not determine whether the ALJ's "conclusion [wa]s supported by substantial evidence").

The record contains medical evidence that suggests that Plaintiff's impairments meet Listing 1.04(A). For example, Dr. Davy noted that a straight leg-raising test and a "Spurling" test were both positive, (R. 413), as did Dr. Nangia, (R. 341). The nerve conduction studies that

Dr. Nangia performed both revealed evidence of radiculopathy.  (R. 338, 377.)  Plaintiff

consistently reported that his back pain radiated and caused numbness in his arms and legs, (*e.g.*,

R. 592), and Dr. Nangia twice noted that Plaintiff had diminished sensation in his left arm, (R.

326, 425.)  Dr. Nangia and Dr. Gordon both noted that Plaintiff's spine showed limited ranges of

motion.[7]  (R. 341, 343.)  Because the Court cannot determine whether the ALJ's Step Three

determination is supported by substantial evidence, and because the evidence in the record

suggests that the ALJ's decision is not supported by substantial evidence, the Court remands this

matter for further administrative proceedings.  *See Nelson v. Colvin*, 114 F. Supp. 3d 69, 73

(W.D.N.Y. 2015) ("Because I find that there is substantial evidence in the record which might

satisfy the requirements of Listing 1.04, and because the ALJ failed to set forth any analysis of,

or explanation for, his finding that Listing 1.04 was not satisfied, the matter is remanded for

further proceedings."); *Cherico*, 2014 WL 3939036, at *28 ("There is record support for each of

these symptoms.  Necessarily, then, the ALJ was required to address that evidence, and his

failure to specifically do so was error that would justify a remand."); *Wood*, 987 F. Supp. 2d at

---

[7]  Plaintiff contends that the September 4, 2013 MRI establishes nerve root compression. (Pl. Mem. 20.)  The Commissioner argues that the Appeals Council properly determined that this evidence, which was not before the ALJ but was submitted only to the Appeals Council, does not relate to the relevant period and, therefore, does not render the ALJ's decision contrary to the weight of the evidence.  (Comm'r Mem. 30–31.)  "The Appeals Council, in reviewing a decision based on an application for benefits, will consider new evidence only if (1) the evidence is material, (2) the evidence relates to the period on or before the ALJ's hearing decision, and (3) the Appeals Council finds that the ALJ's decision is contrary to the weight of the evidence, including the new evidence."  *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010) (citing 20 C.F.R. § 416.1470).  Because the September 4, 2013 MRI occurred almost three years after September 30, 2010, Plaintiff's last insured date, (R. 2), the Appeals Council properly found that the MRI did not relate to the relevant period, *see Guile v. Barnhart*, No. 07-CV-259, 2010 WL 2516586, at *1–2 (N.D.N.Y. June 14, 2010) (holding that an MRI that occurred seven months after the ALJ's decision did not relate to the relevant period because "it provide[d] only a snapshot of [the claimant's] condition several months after the ALJ's decision" and did not "offer any retrospective opinion as to [the claimant's] condition during the relevant period").

195 ("The Court cannot discern whether the [ALJ's] decision was based on the correct application of legal principles or is supported by substantial evidence and therefore remands the matter for further development of the record." (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980))).

## ii. The ALJ's RFC determination

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because he improperly accorded reduced weight to the opinions of Dr. Nangia, Dr. Davy and Dr. Piazza, and because he failed to consider medical evidence contained in the reports of Dr. Piazza, Dr. Davy and Dr. Gordon. (Pl. Mem. 24–26.) The Commissioner argues that the ALJ properly discounted the opinions of Dr. Nangia, Dr. Davy and Dr. Piazza because their opinions were legal conclusions that were not entitled to any deference. (Comm'r Mem. 24–25.)

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[8] 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because

---

[8] A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

An ALJ must consider a number of factors to determine how much weight to assign a treating physician's opinion, including: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' or the weight given to a treating physicians['] opinion . . . .").

The ALJ gave "little weight" to the opinions of Dr. Nangia, Dr. Davy and Dr. Piazza, "who opined that the claimant is totally disabled from all work." (R. 22.) The ALJ did not

commit any error in disregarding the opinions from these doctors that Plaintiff was totally disabled. *See Taylor v. Barnhart*, 83 F. App'x 347, 349 (2d Cir. 2003) (noting that a treating physician's opinion that the claimant "was 'temporarily totally disabled' [wa]s not entitled to any weight, since the ultimate issue of disability is reserved for the Commissioner" (first citing 20 C.F.R. § 404.1527(e)(1); and then citing *Snell*, 177 F.3d at 133)). However, although "[r]eserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability," this does not "exempt administrative decisionmakers from their obligation, under [the treating physician rule], to explain why a treating physician's opinions are not being credited." *Snell*, 177 F.3d at 134; *Austin v. Colvin*, No. 14-CV-861, 2016 WL 335255, at *5 (W.D.N.Y. Jan. 28, 2016) (quoting *Snell*, 177 F.3d at 134)). Thus, the ALJ was still required to explain his reasoning for giving reduced weight to the medical findings and opinions of Dr. Nangia, Dr. Piazza and Dr. Davy. *See Leroy v. Colvin*, 84 F. Supp. 3d 124, 133–34 (D. Conn. 2015).

In reaching the conclusion that Dr. Nangia's opinion merited only little weight, the ALJ considered and weighed the medical evidence contained in Dr. Nangia's reports. (R. 22.) For example, the ALJ noted that the objective testing conducted by Dr. Nangia established that Plaintiff was "preclude[d] from performing his past work" but that it did "not support a finding that he cannot perform any work at all." (*Id.* (comparing the February 2009 MRI with the nerve conduction studies performed by Dr. Nangia).) The ALJ therefore provided a basis for giving reduced weight to Dr. Nangia's opinion. *See Illenberg v. Colvin*, No. 13-CV-9016, 2014 WL 6969550, at *20 (S.D.N.Y. Dec. 9, 2014) ("Under the treating physician's rule, it is 'within the province of the ALJ' to resolve conflicts in the medical evidence in light of all evidence in the record." (quoting *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002))).

However, the ALJ failed to properly explain why he gave little weight to the opinions of Dr. Piazza[9] and Dr. Davy. As to Dr. Piazza, the ALJ only mentioned Dr. Piazza once, noting "that during a September 2009 examination with Dr. John Piazza, the claimant reported that his lower back pain was getting progressively better." (R. 22.) The ALJ erroneously failed to consider Dr. Piazza's examination findings and opinions and failed to properly explain why he gave them little weight. For example, upon examining Plaintiff's spine, Dr. Piazza repeatedly found "subluxation" at various points along the spine, "edema," "myospasms," "hypertonicity," "trigger points," and noted that "Deerfield" tests and straight leg raising tests were positive. (E.g., 538, 544, 557, 576, 583.) Before according Dr. Piazza's findings and opinions little weight, the ALJ was required to consider this evidence in order to properly explain his reason for why it merited little weight. *See Poles v. Colvin*, No. 14-CV-6622, 2015 WL 6024400, at *4 (W.D.N.Y. Oct. 15, 2015) (holding that, where the ALJ omitted records that undermined his conclusion, the ALJ's conclusion was "improperly based on a selective citation to, and mischaracterization of, the record" and "not supported by substantial evidence" (citing *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82–84 (2d Cir. 2009)); *Nigro v. Astrue*, No. 10-CV-1431,

---

[9] Although "chiropractors are not 'accepted medical sources' whose opinions are entitled to controlling or even special weight," an ALJ "may not flatly reject them without explaining his basis for doing so." *Nigro v. Astrue*, No. 10-CV-1431, 2011 WL 4594315, at *5 (E.D.N.Y. Sept. 30, 2011) (collecting cases). An ALJ has discretion to determine "[h]ow much weight to give" the opinions of a chiropractor, but "should consider the opinions" and "explain what weight he gives those opinions." *Id.*; *see also Mortise v. Astrue*, 713 F. Supp. 2d 111, 126 (N.D.N.Y. 2010) (noting that a chiropractor's "opinion is not treated with the same deference as a treating physician's opinion, but is still entitled to some weight, especially when there is a treatment relationship with the [p]laintiff" (collecting cases)); *Carlantone v. Astrue*, No. 08-CV-07393, 2009 WL 2043888, at *5 (S.D.N.Y. July 14, 2009) (noting that although chiropractors "are not considered acceptable medical sources for the purposes of establishing an impairment," the opinions of chiropractors "are acceptable to show the severity of [a] claimant's impairments" and holding that "the ALJ should consider the opinions of [the claimant's chiropractor's] and explain what weight he gives those opinions" (alterations and internal quotation marks omitted) (citing 20 C.F.R. § 404.1513(a), (d))).

2011 WL 4594315, at *5 (E.D.N.Y. Sept. 30, 2011) (remanding because the ALJ "flatly

rejected" the opinions of the claimant's chiropractor "without explaining his basis for doing so");

*cf. Figueroa v. Astrue*, No. 04-CV-7805, 2009 WL 4496048, at *12 (S.D.N.Y. Dec. 3, 2009)

(affirming the ALJ's decision to give a chiropractor's opinion "minimal weight" because "the

ALJ explicitly stated in his decision that he 'did consider the report from the claimant's treating

chiropractor' . . . but that 'the opinion of the chiropractor is contradicted by the opinion of the

consultative physician, . . . by the claimant's conservative course of treatment, by the objective

medical findings of record, and by the claimant's wide range of daily activities'").

　　As to Dr. Davy, the ALJ only mentioned Dr. Davy once, (*see* R. 22 ("Accordingly, little

weight is given to the opinions of Dr[s]. Nangia, Davy, and Piazza, who opined that the claimant

is totally disabled from all work.")), and never discussed Dr. Davy's findings and opinions.

However, Dr. Davy observed that Plaintiff's gait was antalgic, that Plaintiff exhibited pain on

forward flexion, and that a straight-leg raising test and Spurlings test were both positive, and he

diagnosed Plaintiff with lumbar and cervical radiculopathy.  (R. 414.)  Before according Dr.

Davy's findings and opinion little weight, the ALJ was required to discuss this evidence.  *See*

*Arias v. Astrue*, No. 11-CV-1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012) (An ALJ

"may not simply ignore contradictory evidence . . . the ALJ must acknowledge the contradiction

and explain why the conflicting [evidence] is being disregarded."); *Bolden v. Comm'r of Soc.*

*Sec.*, 556 F. Supp. 2d 152, 165 (E.D.N.Y.2007) ("[T]he ALJ must always give good reasons in

her decision for the weight accorded to a treating source's medical opinion." (internal quotation

marks omitted) (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998))).

　　Moreover, the ALJ never discussed Dr. Gordon who noted that Plaintiff exhibited limited

neck and back flexion and extension and paraspinal pain, spasms and tenderness.  (R. 343.)  The

ALJ erred when he ignored these medical findings and failed to explain what weight he accorded them. *See Estela-Rivera v. Colvin*, No. 13-CV-5060, 2015 WL 5008250, at *13 (E.D.N.Y. Aug. 20, 2015) ("'Regardless of its source,' Social Security regulations require that 'every medical opinion' in the administrative record be evaluated when determining whether a claimant is disabled under the Act." (quoting 20 C.F.R. ¶¶ 404.1527(d), 416.927(d))); *Emsak v. Colvin*, No. 13-CV-3030, 2015 WL 4924904, at *11 (E.D.N.Y. Aug.18, 2015) ("Nowhere on the record did the ALJ discuss the merits of [the claimant's licensed clinical social worker's] opinions . . . . Therefore, the ALJ erred by failing to weigh every medical opinion, as required by 20 C.F.R. § 416.927(c).").

By failing to consider the findings of Dr. Piazza and Dr. Davy, and by ignoring Dr. Gordon's findings and opinion, the ALJ failed to provide good reasons for according little weight to Dr. Piazza and Dr. Davy, and not according any weight to Dr. Gordon, which warrants remand.

### iii. The ALJ's credibility determination

Plaintiff argues that the ALJ erred in finding that he was not credible as to the intensity, persistence and limiting effects of his impairment because the ALJ improperly weighed whether Plaintiff's testimony was consistent with the medical evidence in the record. (Pl. Mem. 28–30.) The Commissioner argues that the ALJ correctly determined Plaintiff's credibility because her testimony was inconsistent with substantial evidence in the record. (Comm'r Mem. 26–29.) Because the Court remands the case for further consideration of the medical evidence, the Court will not address Plaintiff's argument as the ALJ's errors impact the Court's ability to review the credibility determination.

### iv.   Remand for the purpose of calculation of benefits

Plaintiff contends that the Court should remand this case solely for the purpose of calculation of benefits because "the medical opinions in the record consistently indicate that Plaintiff could not perform full time work."  (Pl. Mem. 19.)

Generally, when a court determines that the findings of an ALJ are not supported by substantial evidence or the ALJ has applied an improper legal standard, remand is appropriate to further develop the evidence in the record.  *See Butts*, 388 F.3d at 385; *see also Wheeler v. Comm'r of Soc. Sec.*, No. 15-CV-105, 2016 WL 958595, at *12 (N.D.N.Y. Mar. 7, 2016) ("Remand to the Commissioner for further development of the evidence is appropriate when there are gaps in the administrative record or where the ALJ has applied an improper legal standard." (citing *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999))).

However, if the court determines that a claimant has met his burden of showing disability at the first four steps, and the Commissioner has failed to meet her burden of rebuttal, a court may remand for further proceedings or may remand solely for calculation of benefits.  *Butts v. Barnhart*, 416 F.3d 101, 104 (2d Cir. 2005) (holding that because the Commissioner failed to meet her burden to provide vocational testimony about the availability of appropriate jobs, thus failing to meet burden of rebuttal at the fifth step, it was not an abuse of discretion to remand for further proceedings but noting that "the ordering of a benefits calculation was hardly out of the question"); *Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000) (Where reversal is based solely on the Commissioner's failure to sustain his burden at the fifth step, "remand for the sole purpose of calculating an award of benefits is mandated." (citing *Balsamo v. Chater*, 142 F.3d 75, 82 (2d Cir. 1998))), *superseded by statute on other grounds, as recognized in Selian*, 708 F.3d 409; *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) (remand for calculation of benefits

appropriate where step five determination was not supported by vocational expert testimony, noting "we have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose"); *Wheeler*, 2016 WL 958595, at *12 ("Reversal for calculation of benefits is appropriate only if the record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no useful purpose." (citing *Rosa*, 168 F.3d at 82–83)); *Henningsen v. Comm'r of Soc. Sec. Admin.*, 111 F. Supp. 3d 250, 272 (E.D.N.Y. 2015) ("Where 'the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of benefits.'" (quoting *Cherico v. Colvin*, No. 12-CV-5734, 2014 WL 3939036, at *31 (S.D.N.Y. Aug. 7, 2014) (quoting *Parker v. Harris*, 626 F.2d 225 (2d Cir. 1980)))).

The Court cannot determine that Plaintiff has met his burden of showing disability at the first four steps of the sequential analysis because of the ALJ's failure to properly evaluate the medical evidence in the record and properly weigh every medical opinion. *See Catsigiannis v. Astrue*, No. 08-CV-2177, 2013 WL 2445046, at *4 (E.D.N.Y. June 4, 2013) ("[W]here an ALJ fails to adequately evaluate evidence concerning [the claimant's] condition during the relevant period, thus disobeying the requirement to develop the record, full remand for further proceedings by the Commissioner is appropriate." (citing *Snell*, 177 F.3d at 133)); *Anderson v. Astrue*, 2009 WL 2824584 (E.D.N.Y. 2009) (denying the plaintiff's motion for remand solely for the calculation of benefits and remanding for further administrative proceedings because the ALJ used a "'pick and choose' approach to reviewing" evidence). Accordingly, the Court remands for further administrative proceedings.

### III. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and Plaintiff's cross-motion for judgment on the pleadings is granted. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 31, 2016
      Brooklyn, New York